IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL RIGGINS,                    :
                                   :
        Plaintiff,                 :
                                   :
vs.                                :     CIVIL ACTION NO. 1:18-cv-127-TFM-N
                                   :
CYNTHIA STEWART, *et al.*,         :
                                   :
        Defendants.                :

## MEMORANDUM OPINION AND ORDER

This Section 1983 action, brought by Plaintiff Darryl Riggins, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, is now before the Court on Defendants' Motion for Summary Judgment (Docs. 26, 27, 28, 33, 34, 40, 43). As set out more fully below, Defendants' motion for summary judgment is due to be **GRANTED** in part and **DENIED** in part.

## I.   SUMMARY OF PLAINTIFF'S ALLEGATIONS

Plaintiff Riggins brings this suit against Warden Cynthia Stewart, Warden Terry Raybon, Warden Phillip Mitchell, Captain Jeff Emberton, Captain Regina Bolar, Lieutenant Michael Banks, Sergeant Kelvin Lang[1] Classification Specialist William DeSpain, Lieutenant Deveron Brown, Officer Harry Boudreaux, Officer Darious House, Officer Marquino Siler, Officer Johnnie Tait, and Officer Vencini Smith for various Eighth Amendment violations and negligence. His asserted claims are unclear and difficult to understand, in that they reference multiple incidents occurring

---

[1]    Plaintiff Riggins names "K. Lane" as a defendant in this action. (See Doc. 13). However, Sergeant Kelvin Lang has answered the suit and all Holman records related to the date and time of the incident reflect that it was Sergeant Kelvin Lang who was on duty at the time of the incident of this complaint. (See Docs. 27; 27-16). Accordingly, the Court assumes that the proper defendant in this action is Sergeant Kelvin Lang, rather than K. Lane. Thus, this order shall reference Kelvin Lang as a defendant.

upon his return to Holman Correctional Facility ("Holman"). However, the overriding theme of the complaint is that the defendants, with knowledge of a risk of harm, failed to protect him. The suit focuses primarily on an October 8, 2017 inmate attack, which Riggins asserts was caused by Defendants' deliberate indifference to his safety, but Riggins also discusses additional incidents (occurring both before and after the October 8, 2017 attack), and appears to ask the Court to consider these incidents both as separate constitutional violations and as cumulative evidence in support of his supervisory claims, including failure of the supervisory defendants to protect him from both inmates and correctional staff at Holman. And, although Riggins asserts no claim of retaliation, he does insinuate in his complaint that the motive behind the defendants' actions and violations stems from hostility regarding a prior lawsuit which he filed against Holman officials, including Regina Bolar (Defendant in this action).[2] Notably, Riggins was transferred from Holman following the previous incident, but returned to Holman during the litigation of the suit, which the parties' settled in November 2017.[3]

Riggins alleges in his Amended Complaint ("complaint") that he was transferred back to Holman, from Kilby Correctional Facility, on March 3, 2017, and was placed in the segregation housing unit per order of Warden Terry Raybon. (Doc. 13 at 9). Riggins claims he feared for his safety at Holman after officers warned him not to go to the healthcare unit "because he might not live" or that the CERT team may harm him. (Doc. 41 at 3, 43).

On March 14, 2017, during segregation rounds, Riggins handed an inmate request slip to Warden Terry Raybon, asking for extra clothing items, a washcloth and towel, laundry bag, and

---

[2]     See Riggins v. Myers, Civ. Act. No. 1:16-cv-390-KD-MU (S.D. Ala. 2017). Riggins filed a § 1983 action against various Holman officials and a Corizon nurse for constitutional violations which occurred in or around July 2014; see also, Riggins v. Corizon, Inc., Civ. Act. No. 1:14-cv-542-KD-N (S.D. Ala. 2014).

[3]     See Civ. Act. No. 1:16-cv-390-KD-MU, Doc. 62.

sheets.  Warden Raybon told Riggins to write on the request slip, "May I go to General Population".

(Id. at 3, 45).  Riggins complied; Terry Raybon took the request slip, and returned the slip to

Riggins later that day with instructions to answer the following questions:

> Do you fear for your life in Pop?
> Do you have any enemies in Population?
> Are you willing to be assigned to any Population Dorm?
> Are you willing to sign a Living Agreement for Population?

(Id. at 45).  Fearing for his life in general population, Riggins did not return the request slip to

Warden Raybon.  And, on March 21, 2017, Riggins verbally informed Terry Raybon that he feared

for his safety at Holman.  (Id.).

On May 14, 2017, Riggins handwrote two administrative complaints.[4]  The first complaint

is addressed to Warden Cynthia Stewart and Classification Specialist William DeSpain, in which

Riggins asserts that he and inmate Antonio Williams, who was also housed in the segregation unit,

are enemies and that inmate Williams had made continuous threats to attack Riggins when Riggins

was cuffed to the rear.  (Id. at 53).  Riggins further asserts in the letter that Inmate Williams

informed him that unnamed prison officials are "willing to pay him (Inmate Williams) or any other

inmate to do [Riggins] serious physical harm."[5]  (Id.).  Subsequent to the submitted letter, Riggins

claims that Captain DeSpain visited Riggins at his segregation cell and told Riggins that Warden

"Stewart ordered him to do nothing to protect Riggins."  (Id. at 4).

---

[4]      Riggins also penned a letter to his attorney (in the ongoing civil action no. 1:16-cv-390-KD-MU in the United States District Court for the Southern District of Alabama) on May 14, 2017, reiterating the contents of the two administrative complaints, namely his fear of an inmate attack and the excessive force used on him the previous day, May 13, 2017.  (Doc. 41 at 50).

[5]      In his response to the motion for summary judgment, Riggins asserts that inmate Williams "made claims [that] the officers had put a hit on Riggins and told [inmate Williams that] Riggins was a known snitch/informant.  (Doc. 41 at 4).

The second complaint, dated May 14, 2017, is addressed to Warden Stewart and Captain Emberton, in which Riggins complains of excessive force used against him on May 13, 2017 by the CERT team (during their search for a cell phone) and requests an investigation be conducted by the Internal Investigation Unit. Riggins claims that on May 13, 2017, between 3:00 p.m. and 3:45 p.m., he was using the toilet in his cell when he was ordered to "cuff up" by the CERT team through the cell tray door. (Id. at 51). Riggins responded, "Yes, let me wipe my ass", and was sprayed with a chemical spray. (Id.). Riggins screamed, "I'm coming", but was sprayed again as he stood at the cell door with his hands to the rear. (Id.). Riggins again "loudly beg[ged]" and said "I'm ready" when he alleges he was sprayed again with the chemical agent and told by the CERT team officer, "No you will be ready when we say you're ready" and was sprayed a fourth time before the officer closed the tray door. (Id.). Riggins contends he was forced to stay in the contaminated cell for approximately 15 minutes "choking, coughing, burning, and struggling to breathe", while repeatedly begging for help and to be removed. (Id.). Riggins alleges that for the entire 15 minutes he remained in the cell, the CERT team officers mocked him with insults and stated, "suffer mother fucker we got til 5:00 p.m. to get your ass out of that cell". (Id. at 53). Once removed from the cell and decontaminated, Riggins was replaced in his cell and denied products with which to clean it. (Id.).

On June 14, 2017, Riggins claims he suffered a seizure in his cell and was found unresponsive on the floor by three ADOC officers (Officers House, Jones, and Bennett) and one nurse (Nurse Gary) during the 1:30 a.m. pill call. (Doc. 41 at 56-59). According to Riggins, the nurse advised of the need for medical treatment, and the three officers stated, "he will be alright just leave him". (Id. at 5, 54).

Riggins further claims that a few hours later, Lieutenant Brown, Captain Smith, Officer Bennett, Officer Tait, Officer House, Officer Siler, Officer Stewart, and Lieutenant Banks came to his cell, saw that he was still seizing, unresponsive, and threw objects at him and poked him with a stick. (Id. at 54). More specifically, he claims that Vencini Smith beat his legs and feet with a push broom and "water squeezy" causing pain and swelling to his legs and feet. (Doc. 13 at 10). Riggins alleges that these defendants made statements including, "We don't care about Darryl Riggins"; "We are not opening that cell door to go get him out"; and "If he die[,] Oh well." (Doc. 13 at 9 (capitalization alterations)).

When Riggins regained consciousness around 7:00 a.m., he claims he was lying in a pool of urine, feces, and blood from biting his tongue. (Doc. 41 at 5). Then, at approximately 10:00 a.m., four CERT team officers came to his cell while he was asleep and screamed, "they would beat the shit out of [him]" if he moved. (Id. at 55). Riggins was handcuffed, thrown to the floor, and questioned about possession of a cell phone. His cell and person were searched, while Riggins repeatedly requested medical treatment for his tongue but was told he "wasn't going anywhere until [he gave] them a cell phone." (Id. at 5). When no cell phone was produced or found, the CERT team officers left and refused Riggins medical treatment for his tongue. (Id. at 5-6).

Riggins alleges he again requested a body chart and medical attention for "his chewed tongue" during the Segregation Review Board's rounds on June 16, 2017, but was refused treatment by Jeff Emberton and Terry Raybon, who responded, "I Don't Need to See Your Tongue, and no you cannot have a medical body chart done." (Doc. 13 at 10).

On October 8, 2017, Riggins was released from the segregated housing unit to general population. He was assigned to Alpha Dormitory (A-Dorm) bed 11-A but asserts that another inmate was occupying bed 11-A and refused to move from the bed. Riggins reported the inmate's

refusal to move from bed 11-A to Captain Regina Bolar. Riggins claims that Captain Bolar and Lieutenant Banks checked the computer for A-Dorm bed assignments, and no inmate was formally assigned to bed 11-A. Riggins alleges that Captain Bolar and Lieutenant Banks went to A-Dorm and the inmate on bed 11-A again refused to move to his assigned bed. (Doc. 41 at 7). Captain Bolar then ordered Riggins to go to Bravo Dormitory (also "B-Dorm" or "Bravo Dorm"). When Riggins entered Bravo Dorm, he claims the B-Dorm inmates approached him and threatened to stab him for being labeled a snitch or informant. Riggins further claims he left B-Dorm and informed Captain Bolar and Lieutenant Banks "that the inmates in Bravo Dormitory were threatening to stab and beat plaintiff for being labeled a snitch if plaintiff did not get out of Bravo Dormitory", and Captain Bolar responded, "Man get out of my face." (Doc. 13 at 4). Riggins alleges that because he feared for his safety in B-Dorm, he sneaked into Delta Dormitory ("D-Dorm") and hid.

At the 9:00 p.m. pill call, Riggins entered the main hall and was questioned by Lieutenant Devron Brown as to his dorm and bed assignment. Riggins answered that he was assigned to bed 11-A but was told by Captain Bolar to find a bed in B-Dorm. Riggins alleges that Lieutenant Brown ordered Defendant Officers Lang, Boudreaux, Tait, House and Siler to escort him to B-Dorm "and make sure he did not get back out." (Id. at 8). Riggins then explained that the inmates in B-Dorm were threatening to stab and beat him if he came back to B-Dorm and requested to go to his assigned A-Dorm. Lieutenant Brown ordered Lang, Boudreaux, Tait, House, and Siler to make sure Riggins went to his "assigned dorm". (Id.). "[M]oments later Defendants came and got Plaintiff to escort plaintiff to Bravo Dormitory and plaintiff stated loudly with a clear voice the inmates in Bravo Dormitory are threatening to stab and beat him if he came in Bravo Dormitory again." (Id.). Sergeant Lang ordered Riggins "to go back where he was", but "Brown pulled out

her mace and threatened to spray plaintiff if plaintiff did not go in Bravo Dormitory as ordered." (Id.). Riggins complied with the order and entered B-Dorm.

Within 30 minutes of entering B-Dorm, Riggins was attacked by several inmates with prison-made knives, broken brooms, and mop sticks. Riggins alleges he was beaten and stabbed more than 15 minutes and that no officer was present inside B-Dorm at the time. Riggins claims he suffered serious stab wounds, "some life threatening to the head, neck, back and arm." (Id.). Riggins further claims that when he made his way to the front gate of B-Dorm, the Cubical 1 Officer was asleep and had to be awakened by Riggins' "screams, hollering, and shaking of the bars for 5 more minutes for help to respond to the code." (Id.). Riggins was taken to the healthcare unit, where it was determined he needed further treatment from the local hospital. Riggins was transported to Atmore Community Hospital and then to Mobile Infirmary in Mobile, Alabama. Riggins returned to Holman on October 10, 2017, and was placed in the hospital ward. Riggins alleges that while in the hospital ward, Terry Raybon stated to him, "I told you so. This ain't the same Holman prison." (Id.) (capitalization altered). On or around October 13, 2017, Riggins was released from the hospital ward and reassigned to the segregation unit.

Riggins alleges that on February 28, 2018, Officer Pacheco opened his tray door at approximately 1:30 p.m. and told him "to sign up for sick call because he and Officer C. Arthur were going to physically beat [his] ass." (Doc. 41 at 67). Officer Pacheco then sprayed a burst of mace in Riggins' face, closed the tray door, and "walked away laughing saying now go tell that you snitching mother-fucker." (Id.). Riggins claims he was denied a body chart and decontamination by Officers Pacheco and Arthur and told to "burn and choke until you die black nigga we hate your kind you black motherfuckers ain't shit but shit starter." (Id). At 3:15 p.m., Riggins informed Lieutenant Banks of the situation and was provided a body chart but never

decontaminated or given a shower. (Id.). Riggins notified Warden Stewart of this incident, on February 28, 2018, but Warden Stewart returned his letter, unopened. (Doc. 41 at 10). Warden Stewart further failed to allow Riggins to explain the incident to him on March 14, 2018, during Segregation Review Board rounds. (Id.).

In February 2018, after refusing to return to general population, Riggins was informed by Captain Jeff Emberton that "he would be punished by not being considered for favorable classification considerations." (Doc. 13 at 8-9). Captain Emberton then told Riggins, "It's shoot or be shot, that's the life at the Holman Prison", and Emberton and a group of inmates (in agreement) laughed. (Id. at 9).

Riggins filed this suit pursuant to § 1983 in March 2018 seeking to recover compensatory and punitive damages, as well as a declaratory judgment, equitable relief, costs of litigation, and affirmative action. (Doc. 13 at 7). Riggins was transferred from Holman in July 2018. (Doc. 16).

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the

'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. See Anderson, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." Garczynski, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. Id. In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris,

550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).

### III.    DISCUSSION AND ANALYSIS

"In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." Martinez v. Burns, 459 F. App'x 849, 850-51 (11th Cir. 2012) (citing *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)). The parties do not dispute that Defendants, employed as correctional officers for the State of Alabama, were acting under the color of state law at the time of the complained of incident. Thus, the Court must determine if Defendants have established that there are no genuine facts with respect to Riggins' Eighth Amendment claims.[6]

### A.    Official Capacity Claims.

The Defendants named in this action are all correctional officers employed by the Alabama Department of Corrections. To the extent Riggins has sued each defendant in his or her official capacity, the defendants are immune from suit. "Official-capacity suits ... generally represent only another way of pleading an action against an entity of which an officer is an agent." Penley v. Eslinger, 605 F.3d 843, 854 (11th Cir. 2010) (citation omitted); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009) ("A claim asserted against an individual in his or her official

---

[6]    For the sake clarity, the Court has recategorized and reorganized Riggins' claims.

capacity is, in reality, a suit against the entity that employs the individual.") (citation omitted). As a practical matter, then, Riggins' § 1983 claims against Defendants in their official capacities functionally reduce to § 1983 claims against the State itself.

The Eleventh Amendment protects Defendants in their official capacities from Riggins' claims. See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984) (With some exceptions, "a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. This jurisdictional bar applies regardless of the nature of the relief sought." (citations omitted)); Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) ("[S]tate officials sued in their official capacity are []protected by the [Eleventh A]mendment." (citing Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)). In addition, "a state agency[] and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable..." Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1524 (11th Cir. 1995) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)). Thus, Defendants, in their official capacities, are immune from suit for monetary damages.[7]

**B.    Eighth Amendment Claims.**

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive

---

[7]    While Defendants are not absolutely immune from suit in their individual capacities, Defendants have asserted the defense of qualified immunity, which "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F. 3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)). Qualified immunity, however, is not applicable in the Eighth Amendment excessive force case, as "'the subjective element required to establish [the constitutional violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution." Bowden v. Stokely, 576 F. App'x 951, 954-55 (11th Cir. 2014) (quoting Johnson v. Breeden, 280 F.3d 1308, 1321-22 (11th Cir.2002)).

fines imposed, nor cruel and unusual punishments inflicted." US CONST. amend. VIII. The Eighth Amendment's proscription against cruel and unusual punishment prohibits prison officials from exhibiting deliberate indifference to a substantial risk of serious harm to an inmate. Farmer v. Brennan, 511 U.S. 825, 828, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); see also Robinson v. California, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1972) (Eighth Amendment is applicable to the states through the Fourteenth Amendment).

In order to prevail on an Eighth Amendment claim, an inmate must make both an objective and a subjective showing. In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the court delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

25 F.3d at 983. To prevail on constitutional claims like the ones asserted by Riggins, he must prove that there was "a substantial risk of serious harm," that the defendant was subjectively deliberately indifferent to that risk, and causation. Hale, 50 F.3d at 1582; see also Farmer, 511 U.S. at 832-34. In defining "deliberate indifference," the Supreme Court has stated:

> With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. See e.g., LaMarca v. Turner, 995 F.2d 1526, 1535 (CA11 1993). . . .It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.

Farmer, 511 U.S. at 836. Thus, the Court concluded that the "subjective recklessness" standard of criminal law is the test for "deliberate indifference" under the Eighth Amendment. Id. at 839-40. Under this test, there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not . . . ." Id. at 838. It is not enough that an inmate proves that the

defendant should have known of the risk, but did not, as actual knowledge is the key. See, e.g., Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996).

Furthermore, "[i]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted). If a supervisor's liability cannot be established based on the supervisor's personal participation in the complained acts, a plaintiff must show a causal connection between the supervisor's actions and the alleged constitutional deprivation. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

Valdes v. Crosby, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)). A custom is established by showing "a longstanding and widespread practice [such that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (A custom requires showing a practice so settled and permanent that it takes on the force of law). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." West v. Tillman, 496 F.3d 1321, 1329 (11th Cir. 2007) (quotation marks and citations omitted).

It is against these legal standards that the Court will analyze Riggins' claims.

### i.    May 13, 2017 Incident.

Riggins alleges that on May 13, 2017, five CERT team officers sprayed him with a chemical agent (no less than four times) and laughed and mocked him as he begged and pleaded for help from the burning, coughing, and difficulties breathing.  Defendants contend that the force used against Riggins on May 13, 2017 was necessary after Riggins failed to comply with direct orders.  In support, Defendants rely on the Incident Report and Duty Officer Report from May 13, 2017, which states that at approximately 5:00 p.m., the Southern CERT team approached Riggins' cell to conduct a search for contraband, and Riggins refused several direct orders to submit to restraints.  Officer Jermaine Bullard observed Riggins throw a cell phone and cell phone charger into his toilet in attempt to destroy evidence.  Sgt. Jesse Wilson administered a one second burst of "Sabre Red" to the facial area of Riggins in attempt to preserve evidence.  Riggins, however, flushed the phone and charger before submitting to the restraints.  Riggins was then taken to the health care unit and received a medical assessment and decontamination from the chemical spray.  Defendants contend Riggins was then returned to the segregation unit pending disciplinary action.  (Doc. 27-13 at 1, 4).  The body chart received indicates that Riggins was examined at approximately 4:40 p.m. and noted only a few small scratches observed on his left hand.  (Doc. 27-13 at 2).  The use of force was investigated by Warden Terry Raybon and found to be justified given Riggins' failure to obey the orders of the CERT team.  (Doc. 27-13 at 3).

It is unclear from Riggins' complaint whether or not he asserts a claim for excessive force used on May 13, 2017.  To the extent he does, his claim fails.  Review of the pleadings reveals Riggins has failed to connect liability to any named defendant who personally participated in the May 13, 2017 incident.  Accordingly, it is unnecessary for the Court to determine whether or not excessive force was used against Riggins.  Likewise, Riggins has failed to connect the CERT

team's alleged excessive force to a policy or custom of a named supervisory official, nor does he allege that a named supervisory defendant directed the CERT team officers to act unlawfully on May 13, 2017 or had knowledge that they would.

Instead, Riggins appears to rely on the facts that (1) he did not receive a disciplinary charge for failure to obey an order in connection to this incident, and (2) he informed Warden Stewart and Captain Emberton of this incident to bolster his claim that the supervisory defendants were aware that "threats of violence and intimidation was being visited upon Riggins. . . by inmates and officers alike", prior to the October 8, 2017 inmate attack. (Doc. 41 at 13). Accordingly, the Court will also discuss this incident in light of potential supervisory liability.

### ii. June 14, 2017 Incident.

Plaintiff Riggins alleges that on June 14, 2017, he was found unresponsive on his cell floor by multiple officers after suffering a seizure and (over the span of at least six hours) no one took him to the health care unit for medical treatment. In connection to this incident, Riggins is suing (1) Officers Banks, Brown, House, Siler, Smith, Tait, and Raybon for failing to provide him medical treatment for his tongue, which was bitten and/or chewed during the seizure, and (2) Officer Smith for beating him with a push broom and water squeezy until his legs and feet were swollen and painful, while he lay unresponsive on the cell floor. In their special report, the defendants generally deny knowledge of any "June incident" alleged by Riggins (see doc. 27 at 4, n.2, n.4), and have otherwise provided limited responses to the allegations related to the June 14 incident. Notably, Warden Terry Raybon declares by affidavit that he did not order Riggins to be left in his cell unresponsive and without medical attention on June 14, 2017. (Doc. 27-2 at 2-3). Officer Banks denies that he stated, "'If he is dead, oh well' and 'We ain't going in that cell to get him.'" (Doc. 27-6 at 1). Officer Smith submits a blanket denial that he did not violate Riggins'

rights on October 8, 2017 or any other day. (Doc. 34-1). And, the affidavits of Officers Brown, House, Siler, and Tait are void of any mention or response to the June 14 incident and allegations asserted against them. (See Docs. 27-9, 28-1, 27-11, 27-12, respectively).

In opposition to this motion, Riggins admits that this incident was "never documented" by Holman officials and further surmises that that was the intent or strategic purpose behind Warden Raybon's continuous denial of a body chart/medical care. Riggins underscores, however, that the existence of the incident can be proven through the timely letters he wrote and sent to his then attorney Wallace Mills, emails from Wallace Mills, and ADOC lawyers that contacted Riggins. (Doc. 41 at 5, 54-55, 56-58, 60-66). In further support of his claim, Riggins has submitted the letters penned to his then attorney (dated June 14, 19, and 27, 2017, respectively), as well as the sworn statement of Inmate Kendarrius Daniels, who witnessed the incident.

According to Inmate Daniels, who was assigned to an adjacent cell in the segregation unit on June14, 2017, "inmates began screaming and hollering man down, man down" and "kicking & beating the cell doors and throwing food trays " to get an officer's attention when Riggins did not remove his breakfast tray from the tray slot around 3:00 a.m. (Doc. 41 at 62). Officers Bennett and Jones arrived at Riggins' cell and radioed that Riggins was unresponsive, to which Lieutenants Brown and Banks provided additional assistance. Officer Bennett stated to them that Riggins should have been removed and taken to the health care unit when he was first found at pill call, and Lieutenant Brown answered, "Hold up Bennett we don't care about Darryl Riggins", and Lieutenant Banks said, "If he dead oh well we still aint going in his cell to get him out of there." (Id. at 63). While Officers Brown, Banks, Bennett, House, Siles, Jones, and Tait stood outside Riggins' cell, Officer Tait exclaimed, "That's what Darryl Riggins get he should think about that before he filed a lawsuit suing everybody." (Id.). Captain Smith arrived at the cell, and after

calling Riggins' name, he commented that Riggins' was not dead because his eyes were rolling into the back of his head so he was still breathing. (Id.). Inmate Daniels explains that Captain Smith then got a push broom and threw it into the cell at Riggins; next, Smith took a "water squeezy and reached in the cell and started hitting Riggins with it [and stated,] he ain't respond to that leave him in there until the CERT team comes in the morning[.] These are Warden Raybon's orders and they all left and never took Riggins to the health care." (Id.).

Riggins expounds in his letters to his attorney (in his prior lawsuit) that following the incident, on June 16, 2017, during Segregation Review Board rounds, he stopped Warden Terry Raybon and Captain Emberton in attempt to get a body chart and have his tongue examined, but both officers refused him medical treatment. (Doc. 41 at 56-58). He further states in his letter that on June 17, 2017, Officer Bennett came to his cell to check on Riggins. Riggins writes that Officer Bennett told him:

> Riggins are you alright look I went off on Lt. D. Brown, Lt. Bank, & Capt. Smith because they refused to take you out of the cell the other night when you were unresponsive and appeared not to be breathing. Lt. Bank keep saying if you die oh well but we ain't going in there to get him.
>
> Officer R. Bennett said [when Riggins was discovered on the floor at pill call] . . . they notified shift supervisors Lt. D. Brown & Lt. Bank and both of the shift supervisors came to my cell looked in and called for me and I was still unresponsive[. T]hey wouldn't let anyone open the door to get me medical treatment and they left[. A]nd about 2 hrs. later I appeared to not be breathing at breakfast when an inmate found me and Lt. D. Brown & Lt. Banks were called again the[y] came and still said the same thing[,] If I'm dead oh well. They called the Captain Smith and when Capt. Smith came he reached through the cell tray door and beat & poked me with a water squeezie and I was still unresponsive and didn't move after being hit so hard several times but they still did not get me medical treatment and started saying I'm suing everybody so they really don't care about me[. T]hen he said Warden T. Raybon was called at home and Warden T. Raybon told them to leave me in the cell until the CERT team came in at 6:00 a.m. . . .
>
> But Officer R. Bennett came to me and told me that was very upset for them to have treated me so poorly and I could have died and they knew it from the Warden all the way down and Officer R. Bennett said he's willing to tell the truth if my lawyer

come to question him and he's not gone lie for anyone they were wrong and was playing God with my life and he did not like it at all cause they put [h]is job in harms way.

(Doc. 41 at 56-58).

###### a.    Excessive Force Claim against Defendant Smith.

Turning to Riggins claim for excessive force against Defendant Captain Smith, Riggins is required to first show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation, meaning defendants' conduct "shocks the conscience," Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1196 (11th Cir. 2003), and, second, Riggins must show that "the officials act[ed] with a sufficiently culpable state of mind," i.e., that they acted "maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).  "Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting Whitley v. Albers, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)).  The factors used to determine whether there has been a violation of the Eighth Amendment in the prison security context are: the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts to temper the severity of a forceful response, and the extent of injury suffered. Hudson, 503 U.S. at 7 (citing Whitley v. Albers, 475 U.S. 312, 321, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1985)).

No doubt, the poke and prod method chosen by Defendant Captain Smith to check on a man found lying on the floor was callous, inconsiderate, and, arguably, inhumane; however, the subjective intent necessary to evidence a constitutional violation is lacking.  The record evidence indicates that Defendant Captain Smith was attempting to investigate whether or not Riggins was

dead, alive, or pretending when he threw a broom at Riggins and hit him with the water squeezy, as the record is void of details that the attention getting swats continued beyond what was necessary to determine the responsiveness of Riggins, and is further void of any lasting or continued injury which would indicate that Defendant Smith "beat" him for a sustained length of time or for the purpose of inflicting pain. Notably, Riggins never sought medical attention for his legs or feet following the incident (only his tongue). Accordingly, while the Court does not condone Defendant Smith's actions (and in fact finds the conduct disturbing), it cannot be said that Defendant Smith utilized force for the purpose of punishing Riggins or to inflict pain as required to establish an Eighth Amendment violation. Instead, it appears when yelling at Riggins did not get his attention or convince him to move, Defendant Smith attempted to deduce how responsive Riggins was – despite that his enlisted technique was unprofessional and imprudent, to say the least. Accordingly, Defendant Smith is **GRANTED** summary judgment as to the claim that he used excessive force against Riggins on June 14, 2017.

### b.    Denial of Medical Care following a seizure.

Riggins also alleges that Defendants are liable for failing to provide him medical treatment on June 14, 2017. Deliberate indifference to an inmate's serious medical need violates the Eight Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). However, not all denial of medical treatment equates to a constitutional violation. Id. at 105. To establish deliberate indifference to a medical need, a plaintiff must allege facts to need the objective and subjective prongs discussed previously. That is, first, the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 n. 9 (2002)).  "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).  Second, a plaintiff must satisfy the subjective requirement of an Eighth Amendment denial of medical care claim by demonstrating "deliberate indifference" to a serious medical need, that is: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010).

Based on the current record before the Court, and viewing the record in the light most favorable to the non-moving party, Blue v. Lopez, 901 F.3d 1352, 1357 (11th Cir. 2018), the Court finds that Riggins has raised a genuine issue of material fact as to whether or not he was denied medical care in violation of the Eighth Amendment to defeat summary judgment.  While Defendants Raybon, Banks, and Smith deny the allegations asserted against them, Defendants Brown, House, Siler, and Tait have failed to respond to the allegations, and the defendants arguably deny the existence of the June 14, 2017 incident, the record reflects that Riggins has gone beyond his complaint allegations and presents three letters (written on June 14, 19, and 27, 2017, respectively) which provide details of the alleged incident and names of potential witnesses; he also attaches the sworn declaration of an eyewitness confirming his description of the event.  Accordingly, if Riggins' version of the facts are credited, he has demonstrated that the defendants (1) observed him lying on his cell floor, (2) found him unresponsive to name calling, yelling, bar kicking, and hitting and prodding, (3) saw him on the floor for several hours, and (4) witnessed his eyes rolling to the back of his head.  Additionally, Riggins has put forth numerous statements

made by the defendants, which if true, reflect a total disregard for his health, safety, and even life. Based on the foregoing, a reasonable jury could conclude that Riggins suffered a serious medical need and that the defendants were deliberately indifferent to the same. Riggins has carried his burden of showing material facts are in dispute, including not only the deliberate indifference to a medical need but the actual existence of the event in question. Thus, the Court is presented with conflicting versions of events and credibility issues which preclude summary judgment. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 120 S. ct. 2097, 147 L. Ed. 2d 105 (2005) (Credibility determinations at the summary judgment stage are impermissible.); Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006) (If the existence of a material fact turns on credibility determinations, then summary judgment is improper.).

Accordingly, Defendants Banks, Brown, House, Siler, Smith, Tait, and Raybon are **DENIED** summary judgment as to Plaintiff's claim that they failed to provide him medical care following a seizure on June 14, 2017.

In contrast, Riggins' claim that Defendants Raybon and Emberton subsequently denied him medical care for his tongue on June 16, 2017, fails to state a constitutional violation. Riggins merely asserts that on June 16, 2017, Defendants denied him medical treatment for his "chewed" tongue. (Doc. 13 at 10). The record lacks any indication that Riggins sought medical attention through sick call requests, medical grievances, letters to officials, or verbal requests in the days intervening between the alleged seizure and Defendants' denial of treatment on June 16, 2017. Furthermore, Riggins does not complain of symptoms or issues related to his tongue, including continued bleeding, pain, need for stiches, infection, etc., on June 16, 2017, or thereafter. Accordingly, Riggins' tongue amounts to a minor injury, and it is well-established, minor injuries do not normally rise to the level of seriousness to support a viable medical indifference claim under

the Eighth Amendment.  See Fernandez v. Metro Dade Police Dep't, 397 F. App'x 507 (11th Cir. 2010) (bloody nose and mouth, which lasted over five minutes, facial bruising, pain, disorientation, and blood clogs in his nose did not create an objectively serious medical need); McKnight v. Garriott, Civ. Act. No. 3:15-cv-159-J-39JRK, 2018 WL 6019706, 2018 U.S. Dist. LEXIS 195489 (M.D. Fla. Nov. 16, 2018) (Plaintiff's injuries of bleeding from face, wrists and shoulder, swelling to left side of face, significant abrasion to his head, back and torso pain, and headaches were minor because he did not require treatment from a hospital, sutures, or surgical intervention.);  Thaxton v. Simmons, No. 9:10-CV-1318, 2013 U.S. Dist. LEXIS 128294, 2013 WL 4806457, at *13 (N.D.N.Y. May 23, 2013) (finding that "no rational juror could conclude that [a cut tongue] which healed on its own in a matter of days was objectively sufficiently serious to sustain an Eighth Amendment deliberate indifference claim").  Consequently, there is no evidence to support that Riggins suffered an objectively serious medical need on June 16, 2017; therefore, Defendants Raybon and Emberton cannot be liable for deliberate indifference to his medical needs at said date, and as to this claim, summary judgment is **GRANTED** in their favor.

Again, Riggins does not assert direct claim against nonparticipating supervisory officials in relation to the June 14, 2017 incident.  Rather, he contends that because supervisory officials subsequently had knowledge that the incident occurred, they were aware that he faced a substantial risk of serious harm at Holman.  Accordingly, the Court will discuss potential supervisory liability as well.

### iii.     October 8, 2017 Incident.

It is undisputed by the parties that Riggins was attacked by inmates at Holman on October 8, 2017.  The Duty Log from the date of the incident shows that Regina Bolar and Michael Banks were the day shift commanders when Riggins was released from the segregation unit at 8:03 a.m.

to population, Bed A-11 in A-Dorm. (Doc. 27-16 at 1). Bolar and Banks left Holman at 6:03 and 6:02 p.m., respectively. (Id. at 7). The Duty Log also dictates that the night shift supervising officials were Commanders Lieutenant Brown and Sergeant Moore, Assistant Shift Commander Kelvin Lang, and Shift Clerk Shayla Pernell, and the relevant stationed guards were Stanley Funk at Cubicle 1, Tim Wetzel in A-Dorm, Marquino Siler in B-Dorm, Darious House as Death Row Rover, and Johnnie Tait and Harry Boudreaux as Segregation Rovers. (Id. at 6). As it relates to this complaint, the duty log reflects the following timeline:

| | |
|---|---|
| 8:37 p.m. | pill call begins |
| 9:00 p.m. | pill call ends |
| 10:58 p.m. | Officer Funk reports "some action going on in Alpha Dorm and that one (1) J3 is bleeding" |
| 11:03 p.m. | Sergeant Lang escorts Riggins "that was bleeding from Alpha Dorm to the Hospital Unit". [8] |
| 12:10 a.m. | Sergeant Lang reports to Central Control that Officer Siler and House were transporting Riggins to Atmore Community Hospital for further medical treatment. |

(Id. at 8-9). The timeline of the duty log is similarly reflected in the Incident Report and Duty Officer Report submitted by the defendants. (Doc. 27-14 at 1, 3). According to Riggins, he repeatedly alerted Defendants that the inmates in B-Dorm labeled him a "snitch/informant" and threatened to "stab" and "beat" him if he reentered B-Dorm. (Doc. 13 at 16). Despite knowledge of this threat, Riggins alleges that he was forced to go to B-Dorm by Defendants, where he was

---

[8] Riggins alleges he was attacked while housed in B-Dorm on October 8, 2017. The prison log from Holman indicates that Riggins was attacked, or seen bleeding in A-Dorm, on the date in question. To date, however, no defendant has disputed Plaintiff's assertion that he was housed in B-Dorm or attacked in B-Dorm, and given that the Court reviews all questions of fact in favor of Plaintiff, the nonmovant, at this stage, the Court assumes the veracity of Plaintiff's allegation that he was attacked in B-Dorm on October 8, 2017.

stabbed.  Defendants have all responded to Riggins claims by providing the following statements through submitted affidavits:

Defendant Bolar declares that Riggins did not tell her or anyone else to her knowledge that he was being threatened nor did she tell Riggins to get out of her face.  (Doc. 27-5).

Defendant Banks affirms that he had no knowledge of any weapons or plans for any inmates to use any weapons to assault inmate Riggins.  (Doc. 27-6).

Defendant Brown avers he saw Riggins on the main hall going to pill call.  Brown inquired about Riggins' dorm status.  Riggins told Brown that he was released from segregation that day and was "assigned to 'B' Dorm."  Brown sought to confirm Riggins' dorm assignment with Central Control and asked Shift Clerk Shayla Pernell to look on IMAS to see what dorm Riggins had been assigned.  Miss. Pernell advised Brown that according to the IMAS computer system that Riggins was assigned to Housing Unit A.  Brown instructed Riggins to return to A-Dorm. Riggins then stated, "Lieutenant Bolar and Lieutenant Banks assigned me to Housing Unit 'B' because Housing Unit 'A' had no beds. . .. If you don't believe me, you can call Lieutenant Bolar and ask her." (Doc. 27-9 at 1-2).  Brown affirms that he instructed Miss Pernell to contact Lieutenant Bolar who confirmed that she did move Riggins to Housing Unit B due to no availability in Housing Unit A, and Riggins stated, "I'm good I don't want to move to 'A' Dorm".  (Id. at 2).  Brown affirms he instructed Officers Marquino Siler, Darious House, and Sergeant Lang to secure inmate Riggins in Housing Unit B.  Brown states that following Riggins' stabbing, while being escorted to the health care unit, Riggins stated, "That's all Holman got?  Let me go back down there to "B" Dorm.  It took three guys to jump me to win.  Is that all Holman got?" (Id.).  Brown denies that Riggins was "forced" to live in B-Dorm or that Riggins ever notified him of a threat to his safety or threats by inmates in B-Dorm.  (Id.).

Defendant Lang states he was in the segregation unit conducting showers on October 8 when the code was called.  He claims when he heard the code he placed all segregation inmates in their cells and responded to the code.  By the time he arrived to the code, Lang affirms that "everything was quelled" and he "returned back to [his] assigned post" to complete segregation showers."  He declares "no knowledge of these allegations." (Doc. 27-7).

Defendant Boudreaux avers he saw Riggins come out of D-Dorm during pill call on Oct. 8, 2017 and he questioned by Brown regarding his assigned housing unit. Boudreaux states that Riggins informed Brown he was assigned to B-Dorm, and after Riggins received his medication, he was ordered to returned to his assigned dorm – B-Dorm.  Boudreaux, and other officers, escorted Riggins back to his assigned B-Dorm.  Boudreaux denies that Riggins informed him or anyone that he

was threatened by any inmate in B-Dorm, nor did Riggins state he had enemies in B-Dorm. (Doc. 27-10).

Defendant Siler affirms that he was on the shower team, in the segregation unit, at the time the event in question occurred and has "no knowledge of the situation." (Doc. 27-11).

Defendant Tait avers that he was performing other duties at the time of the subject incident and is "unaware of the incidents inmate Darryl Riggins mentioned." (Doc. 27-12).

Defendant House declares that he was assigned to the main hall as a monitor on October 8, 2017 during pill call. House further declares that "Lieutenant Devron Brown advised that if inmate Riggins did not get pill call he was to be escorted back to where he came from which was D-Dorm. Inmate Riggins did not want to go back to D-Dorm nor A-Dorm. Inmate Riggins requested to go to B-Dorm because he said his property was already in B-Dorm." (Doc. 28-1). House avers that Riggins never spoke to him directly and denies Riggins informed him that Riggins was being threatened or that anyone wanted to hurt him. (Id.).

In his response to this Motion for Summary Judgment, Riggins reiterates his original allegations and facts and clarifies that, after pill call, he sneaked back into D-Dorm where he was removed and escorted (by Brown, Boudreaux, Tait, and House) to A-Dorm, based on Shift Clerk Pernell's confirmation that A-Dorm was Riggins' assigned housing unit. (Doc. 41 at 8). Minutes later, Riggins alleges that Defendants Brown, Lang, Boudreaux, Tait, House, and Siler removed him from A-Dorm and took him to B-Dorm. (Id.). Riggins alleges he informed the officers that "his safety and health was being threatened by the inmates in Bravo dorm if he went back in Bravo dorm, and that he would be stabbed and beaten for being labeled a snitch/informant." (Id.). Riggins further alleges he stated this threat "loud and clearly to these defendants not less than three (3) times, and while Defendant Lang told Riggins "to go back to where he was", Defendant Brown "took out her chemical spray and told Riggins she would spray him if he did not go in Bravo dorm as she ordered"; Brown further denied Riggins' request to return to the segregation unit. (Id.).

a. **Defendants Bolar, Banks, Brown, Boudreaux, Lang, House, Tait, and Siler.**

The Eleventh Circuit has "stress[ed] that a 'prison custodian is not the guarantor of a prisoner's safety.'" Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1321 (11th Cir. 2005) (quoting Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990)). "The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act constitutes deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal quotation marks and citations omitted); see also Rich v. Bruce, 129 F.3d 336, 339-40 (4th Cir. 1997) (holding that unless a prison official actually makes the inference that a substantial risk of serious harm exists, he does not act with deliberate indifference even where his actions violate prison regulations or can be described as stupid or lazy). An "official's failure to alleviate a significant risk that he should have perceived but did not" does not constitute deliberate indifference. Farmer, 511 U.S. at 838.

In the current action, it is unclear whether or not Defendants exhibited deliberate indifference on October 8, 2017, that is - were they aware of a significant risk to Riggins or not? The factual allegations of the parties reveal multiple discrepancies, most of which are material and are not clarified by the record. For instance, it is clear that Riggins had no documented enemies at Holman. (Doc. 41 at 49). It is also clear, however, from Riggins' pleadings that he gave notice of a specific threat of harm from the inmates in B-Dorm on October 8, 2017, and further identified the reason behind the potential attack – that he had been labeled a "snitch". Additionally, the defendants' affidavits fail to provide thorough explanations, responses to the allegations against them or details surrounding the incidents of this complaint. Indeed, Defendant Bolar fails to respond to the allegation that she ordered Riggins to move to Bravo Dorm, while Defendant Banks alludes to the fact that Riggins may have been ordered to B-Dorm by claiming "there is no evidence

that inmate Riggins has any enemies at Holman" (Doc. 27-6 at 1), and Defendant Brown affirms that he confirmed with the shift clerk that Regina Bolar did move Riggins to Housing Unit B. (Doc. 27-9). It is also unclear from the defendants' statements which officers personally participated in placing Riggins in Housing Unit B. Specifically, Brown avers she ordered Lang, House and Siler to secure Riggins, but Boudreaux affirms he assisted as well. On the other hand, Riggins alleges Brown, Lang, House, Siler, Tait, and Boudreaux escorted him to B-Dorm. All while, Brown fails to declare whether or not she was present when Riggins was placed in B-Dorm; House affirms only overhearing Riggins and Brown speak in the main hall; and, Lang, Tait, and Siler aver absolutely no knowledge of the incident at all. The conclusory denials of Lang and Siler are extremely problematic when compared against the Holman Duty Log for October 8, 2017. Notably, the duty log reveals that Defendant Lang escorted Riggins to the health care unit following the attack, while Lang avers that the disturbance was "quelled" and that he returned to his duties in the segregation unit? Likewise, the duty log reports that Defendant House and Siler escorted Riggins offsite to Atmore Community Hospital and remained with him for hours until transported to a hospital in Mobile, Alabama; yet, Siler denies any knowledge of the "situation".[9] On the other hand, the duty log fully supports Riggins' identification of the officers that were present and in charge on the date and at the time of the incident.

As the record currently stands, the Court possesses Riggins' version of the facts and Defendants' denial of the same.[10] The law is clear, at the summary judgment stage, it is not the

---

[9] These facts are further supported by the Incident and Duty Officer Report from October 8, 2017. (See Doc. 27-14 at 1, 3).

[10] In response to this motion for summary judgment, Riggins submits the affidavit of Albert Baker, executed under penalty of perjury on October 17, 2017. (Doc. 41 at 70-71). Albert Baker affirms that on October 8, 2017, after pill call, he was standing at the bars in D-Dorm and overheard Lt. Brown order several officers to escort Darryl Riggins back to B-Dorm. According to Baker, Riggins stated to Lt. Brown that he was afraid for his life and safety in B-Dorm "because there

function of the reviewing court to weigh the evidence and determine the truth of the matter; rather, it is to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 252. Where a fact is disputed, the nonmovant's version of the fact is presumed to be true. Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1139-40 (11th Cir. 2007)(citing Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co., 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied.")); Kingsland v. City of Miami, 382 F.3d 1220, 1227 (11th Cir. 2004), cert. denied, De Armas v. Kingsland, 543 U.S. 919, 125 S. Ct. 80, 160 L. Ed. 2d 203 ("The plaintiff's word is merely countered by the defendants' testimony. Given the standard of review at the summary judgment state, we must accept [Plaintiff's] version of the facts as true.) (citing Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002)). In this case, the parties' versions of the incident in question are in direct opposition to one another; the resolve of which turns on an issue of credibility, which may not be determined through a motion for summary judgment. Accordingly, Riggins has presented evidence of a factual dispute that may only be determined by a trier of fact, and summary judgment must be **DENIED** at this time, as to Defendants Bolar, Banks, Brown, Boudreaux, Lang, Tait, House, and Siler, as to the claim of failure to protect on October 8, 2017.

---

were too many stabbings happening in B-Dorm and that there was no officer assigned on post inside B-Dorm." (Id. at 70). Lt. Brown then threatened to spray Riggins with mace if Riggins did not go inside B-Dorm as ordered. Baker avers shortly after Riggins entered B-Dorm, he saw several officers escorting Riggins up the hall bleeding from stab wounds to his back area. While this statement satisfies the needed elements of 28 U.S.C. § 1746, it does not provide the factual specificity to reinforce Riggins' allegations, namely it declares Riggins articulating a generalized fear of B-Dorm, rather than the necessary specific threat or fear required for a constitutional violation.

Riggins also submits the affidavit of Robert Dozier, which supports Riggins' version of the facts; however, the statement is not signed under penalty of perjury and is insufficient to satisfy the elements of 28 U.S.C. § 1746 and defeat summary judgment. (Doc. 41 at 105-107).

### b.    Cubicle 1 Operator and Siler.

Riggins alleges that B-Dorm lacked security at the time of the incident.  First, he asserts the operator of cubicle 1 was asleep at the time of the incident, and he had to awaken the operator to get help.  This claim, however, is belied by the record.  Review of the duty log report reveals that Officer Stanley Funk was the operator of Cubicle 1 at the time of the incident of the complaint.  The log indicates that Funk was aware and observed "some action going on" in the dorm, indicating he was awake and watchful.  (Doc. 27-16 at 8).  While the log confirms that it did take another five (5) minutes for Riggins to be removed from the dormitory (as alleged by Riggins), it was not due to the fact that Officer Funk, Cubicle 1 operator, was asleep.  Riggins has provided no allegations (and the Court finds no support in the record showing) that Funk, the Cubicle 1 Operator, knew of a substantial risk of harm to Riggins and acted deliberately to ignore the risk.  Indeed, the record confirms that Funk reported the attack when it was observed and called a code for assistance from other officers.  For this reason, summary judgment should be **GRANTED** in favor of Defendant "Cubicle 1 Operator".

Second, Riggins alleges in his complaint that there was no officer providing security in B-Dorm at the time of the incident.  The duty log, however, reveals that Marquino Siler was assigned to Housing Dorm B on October 8, 2017.  (Doc. 27-16 at 6).  To the extent that Riggins attempts to assert a claim that Officer Siler failed to protect him as the posted guard on duty, Riggins must establish that Officer Siler not only left his post, but that he did so with knowledge that Riggins was at risk of a serious injury.  See Farmer, 511 U.S. at 828 (Correctional officers may be held liable for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and, with this knowledge, disregards that risk by failing to take reasonable measures to abate it.).  "It is not, however, every injury suffered by

one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." Id. at 834.

Siler avers that at the time of the inmate attack, he was assisting with showers in the segregation unit. Riggins, however, alleges that Siler removed Riggins from A-Dorm to B-Dorm, based on Devron Brown's order, and Riggins "explained to M. Siler that the inmates in Bravo Dormitory was threatening to stab plaintiff if plaintiff being labeled a snitch came back in there." (Doc. 13 at 14); see Farmer, 511 U.S. at 838 (A plaintiff "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety."). At this juncture, it is questionable if Siler knew Riggins was in B-Dorm, that Riggins was at a known risk of harm in B-Dorm, or why Siler was not at his post in B-Dorm. Furthermore, the record lacks documents to verify or confirm either party's version of the events. Accordingly, the Court is presented with questions of material facts and a credibility issue that may not be resolved on a motion for summary judgment. See Bowden v. Stokely, 576 F. App'x 951, 954 (11th Cir. 2014) (Courts cannot resolve credibility disputes where allegations are "not blatantly contradicted by other evidence in the record."); Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006) ("Even if the district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."); Lane v. Celotex Corp., 782 F.2d 1526, 1528 (11th Cir. 1986) ("The district court must not assess[] the probative value of any evidence presented to it, for this would be an unwarranted extension of the summary judgment device."). For these reasons, the Court **DENIES** summary judgment to Defendant Siler at this time.

### c. Defendants Stewart, Raybon, Mitchell, DeSpain, and Emberton.

As to Riggins' claims that the supervisory defendants, Stewart, Raybon, Mitchell, DeSpain,

and Emberton, failed to protect him from the October 8, 2017 attack, despite knowledge of threats against him, "knowledge of the unusually and excessively high violence of stabbings, beatings with broken brooms and mop sticks, and killings of inmate on inmate and officers at the Holman prison" (doc. 41 at 14), as well as knowledge "that there is a problem with tents being put up held together with broken brooms and mop sticks" (id. at 16) the Court finds Riggins has failed to state a claim. Review of the record evidences four handwritten letters addressed to various supervisory officials over the 16 months he was incarcerated at Holman; however, none of the letters identified a fear of going to general population, a fear of being housed in a specific dormitory, fear of stabbing on or around October 8, 2017, or any specific threat of harm.[11] (Doc. 41 at 44, 51-52, 53, 68). Taking Riggins' facts as true, that the supervisory defendants were informed "that his health and safety was being threatened by inmates and officers alike . . .", such a vague claim does not rise to the constitutional level of establishing objective or subjective knowledge of serious risk or actual threat of harm. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (Plaintiff must show "a strong likelihood, rather than a mere possibility [of harm] before a guard's failure to act can constitute deliberate indifference.") (internal quotation marks omitted). Additionally, the record confirms that Riggins did not complain of being released to general population on October 8, 2017, until after he was asked to enter B-Dorm. Indeed, Defendants contend, and Riggins does not dispute, that "Inmate Riggins [] requested consideration for placement in general population on October 4, 2017 and signed an Assignment to General Population form stating he had no enemies

---

[11]     Notably, Riggins informed Mental Health Specialist Mrs. Dodd on March 12, 2017 that he feared for his safety and had received threats not to go to the health care unit (Doc. 41 at 43), and he wrote several letters to his attorney expressing general fear for his safety. (Id. at 41-42, 46, 48-49, 50, 54). However, these letters all lack necessary details of a specific threat to his safety and are addressed to nondefendants in this action. Accordingly, these letters are irrelevant in attributing knowledge to the supervisory defendants in this action.

in general population and that he had not been threatened, coerced, or promised anything to make the statement to go to general population." (Doc. 43-1 at 4). The record is also conclusive that Riggins did not request returning to segregation until Devron Brown allegedly "forced" him to enter B-Dorm after pill call on the evening of October 8, 2017. Notably, Riggins' pleadings indicate that he was content to remain in both Housing Units A and D and that he had no verified enemies in Holman prison on October 8, 2017.[12] (Doc. 41 at 49). Simply put, the record is void of evidence that Riggins notified the supervisory defendants that he did not want to be released to general population on October 8, 2017, nor did he identify any specific threat of harm to a supervisory defendant on or prior to the incident date. See e.g., Chatham v. Adcock, 334 F. App'x 281, 293-94 (11th Cir. 2009) (where no "specific serious threat" from inmate assailant was report to jail official prior to attack, summary judgment in favor of defendants was appropriate); McBride v. Rivers, 170 F. App'x 648, 655 (11th Cir. 2006) (vague allegations of "problems" with another inmate are insufficient to establish that defendant officers were aware of a specific risk of serious harm); Murphy v. Turpin, 159 F. App'x 945, 948 (11th Cir. 2005) ("[T]he allegations of [plaintiff's] complaint do not show the requisite subjective knowledge of a risk of serious harm, and, thus, do not state a claim for deliberate indifference resulting from a failure to protect from the attack by [a fellow inmate]."). Without knowledge of a specific threat of harm (that is, enough details to conclude that a 'strong likelihood' of injury exists, not a 'mere possibility' of harm, e.g., Brooks v. Powell, 800 F.3d 1295, 1301 (11th Cir. 2015)), the supervisory defendants cannot be held liable for failing to protect Riggins from the October 8, 2017 inmate attack. This stringent standard was recently examined and upheld by the Eleventh Circuit in Marbury v. Warden, --- F.3d ---, 2019

---

[12]     Classification Specialist Sizemore replied to Riggins' request to obtain a copy of his validated enemies which listed 2 enemies at St. Clair, 1 at Donaldson, 1 at Bibb, 1 at Childersburg, 11 unassigned, and none at Holman (as of March 22, 2017). (Doc. 41 at 49).

WL 4062675, *5,  2019 U.S. App. LEXIS 26196, *13-14 (11th Cir. Aug. 29, 2019) (discussing "[t]he unfortunate reality [] that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.") (internal quotation and citation omitted).

In Marbury, the Court confirmed the necessity of showing knowledge of a specific threat of harm, rather "than a generalized awareness of risk", in order to make out a deliberate indifference claim.  The Court concluded defendant officers were not deliberately indifferent to the plaintiff's safety, despite that the plaintiff repeatedly asked to be transferred to the segregation unit because he was concerned about a general lack of safety in his cellblock (where he witnessed 15 inmate-on-inmate stabbings in approximately 6 months).  Additionally, the plaintiff's statement that a friend told him an unnamed inmate intended to hurt him was insufficient to put the defendants on notice of a specific and substantial risk of serious harm, and the warden's alleged callous jokes telling the prisoner to get a knife did not show she was aware of a substantial risk of serious harm.  Following Circuit precedent, the Court concludes that Riggins' allegations are completely lacking in details sufficient to show that the supervisory defendants were aware that he faced a substantial risk of serious harm from inmates, in B-Dorm or any dorm at Holman.

Riggins also claims that the practice of the supervisory defendants' "to not assign an officer inside [B-Dorm]" caused his attack.  (Doc. 41 at 14).  This claim, however, is belied by the record. The supervisory defendants declare that, despite staff shortages across Alabama's prisons, adequate staff was present on October 8, 2017.  (Doc. 27-4 at 1).  This is confirmed by the Duty Log which reflects that Officer Marquino Siler was assigned to Housing Unit B on the evening of

October 8, 2017.[13]  (Doc. 27-16 at 6).  Likewise, all Cubicles were manned (id), and Cubicle 1 (which sits directly in front of B-Dorm) is and was manned 24 hours a day.  (Doc. 27-4 at 1). Accordingly, any failure for lack of security in B-Dorm was not due to an action, custom, or policy of the supervising defendants.

Lastly, Riggins claims the supervisory defendants have a policy or custom of ignoring unsafe and violent conditions at Holman, i.e., "stabbings and beatings with broken brooms and mop sticks, and killings of inmate on inmate and officers at the Holman prison.  The tents being erected with the broken brooms and mop sticks."  (Doc. 41 at 14).  Conditions which he claims caused his injury.  In support of his allegation, Riggins attaches approximately 12 articles and/or news reports discussing the violence and understaffing at Holman, and he further references the letters he previously wrote to certain supervisory officials.  (Doc. 41 at 75-104).

While the Eighth Amendment prohibits inhumane prisons, it does not require comfortable ones, Farmer, 511 U.S. at 832, and prison conditions constitute cruel and unusual punishment only when they result in the "unquestioned and serious deprivation of basic human needs." Rhodes, 452 U.S. at 347. "[T]o make out a claim for an unconstitutional condition of confinement, 'extreme deprivations' are required . . . ." Thomas v. Bryant 614 F.3d 1288, 1304 (11th Cir. 2010) (internal citation omitted). This requires establishing the challenged conditions pose "an unreasonable risk of serious damage to [the prisoner's] future health or safety." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004).  To demonstrate a violation of an Eighth Amendment right in a section

---

[13]  Notably, however, the Duty Log reflects that Hall Rover A was assigned, but there were no assignments for Hall Rovers B-D.  (Doc. 27-16 at 6).  It is unclear from the record the distinction in a "Hall Rover B" assignment and "Housing Unit B" assignment.  In their Special Report, Defendants contend that B-Dorm was assigned security on October 8, 2017, and in his response, Riggins does not dispute that Officer M. Siler was the officer assigned.  Thus, the Court concludes the veracity of Defendants 'assertion is not in question.

1983 prison conditions action, a plaintiff must prove three elements: (1) "a condition of confinement that inflicted unnecessary pain or suffering"; (2) "the defendant's deliberate indifference to that condition;" and (3) "causation." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993) (internal quotation marks and citations omitted). The Eleventh Circuit recognizes that the "unjustified constant and unreasonable exposure to violence" violates the Eighth Amendment, id. at 1535, and inmates have a constitutional right to protection from the constant threat of physical assault from other inmates. Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986). It is incumbent on the plaintiff to make an evidentiary showing, however, that a defendant "had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence" and "knowingly or recklessly 'disregard[ed] the risk [of harm] by failing to take reasonable measures to abate it,'" Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1583 (11th Cir. 1995) (quoting Farmer, 511 U.S. at 848), as "merely negligent failure to protect an inmate from attack does not justify liability under § 1983 . . . . The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir.) (citations and internal quotations omitted), 496 U.S. 928, 110 S. Ct. 2624, 110 L. Ed. 2d 645 (1990). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. Thus, a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Hale, 50 F.3d at 1583 (internal quotation omitted).

It is arguable whether or not Riggins has sufficiently alleged and evidenced an excessive risk of violence at Holman. As noted by Defendants, Holman is a security level 5 institution, with the majority of the population serving sentences of life without parole. (Doc. 27-4 at 2). Thus,

violent incidents do occur. (Id.). Assuming, without deciding, that Riggins has satisfied showing

"obvious, flagrant, rampant, and continued" violence reigns at Holman, Brown v. Crawford, 906

F.2d 667, 671 (11th Cir. 1990), cert. denied, 500 U.S. 933, 111 S. Ct. 2056, 114 L. Ed. 2d 461

(1991), Riggins is still "required to produce evidence that, with knowledge of the substantial risk

of serious harm, [the supervisory defendants] knowingly or recklessly disregarded that risk by

failing to take reasonable measures to abate it." Id. (internal quotation omitted); see also Doe v.

School Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1266 (11th Cir. 2010) (Plaintiff's conclusory

assertion of a "history of widespread abuse" was insufficient to put the defendant on notice of an

ongoing constitutional deprivation.).

 The supervisory defendants deny that have failed to take reasonable measure to guarantee

the safety of inmates, including Riggins. Turning to the record, it appears that these defendants

have put rules and protocols in place in attempt to deter the homemade tents and access to objects

that can be used as weapons. The supervisory defendants affirm by personal affidavits:

> Homemade tents are prohibited at Holman and not tolerated (an attempt is made to
> take these items down when observed and confiscate them). Additionally, all
> brooms and mops are to be secured into the supply cages located in each dorm when
> not in use, and an attempt is made each day to remove these items from the
> dormitories. Furthermore, procedures are in place to help lessen the incidents of
> violence, such as frequent, unannounced searches of inmates' persons and living
> quarters, as well as other areas of the institution. Specifically, all officers are
> required to conduct five random searches of the inmates, their personal property,
> and their assigned living areas daily; institutional area searches are performed
> monthly; and, correctional officers constantly monitor inmates' behavior and
> activities. Defendants deny knowledge of poor lighting in the dorm or of receipt of
> any maintenance reports regarding the same. Defendants further contend they have
> no control over the number of inmates assigned to the facility.

(Docs, 27-1; 27-2; 27-3; 27-4; 40-1) (Paraphrased from collective affidavits). Notably, Riggins

does not dispute the measures put in place by the supervisory defendants to reduce the violence at

Holman. Nor does he point to verifiable acts of inmate-on-inmate violence in B-Dorm, whether

resulting from overcrowding, understaffing, or handmade weapons. He does not show that he was exposed to a constant threat of violence by other inmates while at Holman (the majority of his complaints center around excessive force from correctional officers, not fear of other inmates). Nor does Riggins offer evidence or suggestion of improved ways to stop the violence at a maximum-security prison. Consequently, the record indicates that the supervisory defendants have not disregarded the substantial risk of serious harm to Riggins or any inmate. Instead, the record supports that the supervisory defendants have instituted "reasonable measures to abate it." <u>Farmer</u>, 511 U.S. at 858.

Accordingly, Riggins has failed to establish that Defendants Stewart, Raybon, Mitchell, DeSpain, and Emberton were deliberately indifferent to his safety on October 8, 2017, and summary judgment is **GRANTED** in favor of Defendants Stewart, Raybon, Mitchell, DeSpain, and Emberton as to the claims related to said incident.

### iv. February 28, 2018 Incident.

Riggins alleges in his pleadings that excessive force was used against him on February 28, 2018., and Defendant Stewart ignored his attempts to subsequently inform her of the incident. In response to this claim, Defendants have submitted the prison documents regarding the said incident.

The Duty Officer Report reflects that around 2:00 p.m., Lieutenant Pacheco attempted to conduct a search of Riggins' cell, when Riggins refused several verbal orders to be placed in restraints. (Doc. 27-15 at 1). Pacheco administered one spray of Sabre Red towards Riggins' facial area, which Riggins blocked with a blanket. Defendants contend Riggins refused to exit the cell for a medical assessment, so he was allowed to remain in his cell. At the time the Duty Officer Report was written, it documents that Riggins had not been removed from the cell. (<u>Id</u>.). The Investigative Report conducted by Captain Emberton concluded that the use of force by Pacheco

on February 28, 2018 was minimal and justified given Riggins' failure to comply with orders to submit to handcuff restraints.  (Id. at 2).  In response to the use of force, Riggins refused to make a statement, and his only comment to the nurse when he was examined at 3:20 p.m. was "CERT team Lt. Pacheco sprayed me".  (Id. at 4).

To the extent that Riggins asserts a claim of excessive force, his claim fails.  Again, Riggins fails to sue any officer who personally participated in the February 28, 2018 incident.  In his complaint, Riggins asserts only Defendant Warden Stewart as having liability for the associated incident.  Such a claim is rooted in the theory of *respondeat superior* and, as previously discussed, is not cognizable in a § 1983 action.  Edwards v. Ala. Dep't of Corrs., 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support [a] § 1983 claim. . . ."); see also Duff v. Steub, 378 F. App'x 868 (11th Cir. 2010) ("Deliberate indifference can be based on the defendant's personal participation in the allegedly unconstitutional conduct or on the defendant's actions as a supervisor.").  In addition, Riggins does not provide any allegations to causally connect Defendant Stewart to the use of force by way of a "'custom or policy" or with facts supporting "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003).  Accordingly, Riggins falls short of establishing an excessive force claim as to the February 28, 2018 incident.

### v.    Threats and Intimidation.

Riggins broadly complains that he was threatened and verbally harassed by Defendants' callous, inappropriate comments.  It is well established that threats and verbal abuse alone, no matter how unprofessional or offensive, are insufficient to state a constitutional claim.  Hernandez

v. Fla. Dep't of Corr., 281 F. App'x 862, 866 (11th Cir. 2008) (threats and verbal abuse do not rise to the level of a constitutional violation).

> An essential element of a 42 U.S.C. § 1983 action is that the conduct complained of deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. American Manufacturers Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999); Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981). The statements about which Plaintiff complains, standing alone, do not violate the Constitution. Cf. Paul v. Davis, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976). Threatening, derogatory, profane or abusive comments made by correctional officers to an inmate do not rise to the level of a constitutional violation. Edwards v. Gilbert, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989) (verbal taunts directed at plaintiff do not violate his constitutional rights); McFadden v. Lucas, 713 F.2d 143, 147 (5th Cir. 1983) (threatening demeanor of officers undertaken "to enforce reasonable security needs are not violative of a prisoner's constitutional rights."); see also Johnson v. Glick, 481 F.2d 1028 (2nd Cir. 1973); Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y.1998) ("verbal harassment or profanity alone ... 'no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983.") (citation omitted).

Bell v. Holder, 2:11-CV-488-WHA, 2011 WL 7472930, 2011 U.S. Dist. LEXIS 153963, *23-24 (M.D. Ala. Nov. 14, 2011).  While the insults and sarcastic comments directed at Riggins are certainly disrespectful and not what should be expected from corrections professionals, the comments (without unconstitutional actions) do not rise to the level of a constitutional violation. See Ayala v. Terhune, 195 F. App'x 87, 92 (3d Cir. 2006) ("[A]llegations of verbal abuse, no matter how deplorable, do not present actionable claims under § 1983."); McBride v. Deer, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) ("an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment").  Accordingly, Defendants are **GRANTED** summary judgment on Riggins' claim of verbal threats or intimidation.

### vi. Failure to Train Officers.

In his complaint, Riggins asserts in a blanket statement that Defendants Stewart and Mitchell, are liable for failing to train officers.  (Doc. 13 at 17-18).

[A] supervisor can be held liable for failing to train his or her employees "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L.Ed.2d 412 (1989); see also Belcher v. City of Foley, Ala., 30 F.3d 1390, 1397 (11th Cir.1994) ("A supervisory official is not liable under section 1983 for an injury resulting from his failure to train subordinates unless his failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually caused the injury of which the plaintiff complains." (internal quotation marks omitted)). Thus, a plaintiff alleging a constitutional violation premised on a failure to train must demonstrate that the supervisor had "actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights," and that armed with that knowledge the supervisor chose to retain that training program. Connick v. Thompson,[563] U.S.[51, 62], 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011).

Keith v. DeKalb Cnty., Georgia, 749 F.3d 1034, 1052 (11th Cir. 2014).

"As the Supreme Court has indicated, '[a] [supervisor's] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'" Id. at 1053 (quoting Connick, 563 U.S. at 61); cf. Roy v. Johnson, 97. F. Supp. 2d 1102, 1112 (S.D. Ala. 2000) ("In order to state a § 1983 claim against a supervisor for failure to supervise, a plaintiff 'must present some evidence that the [defendant] knew of a need to train and/or supervise in a particular area and the defendant made a deliberate choice not to take any action[,]' that this failure to train and/or supervise constitutes a custom or policy, and that the failure to train and/or supervise was the moving force behind the deprivation of a constitutional right."). A plaintiff may show that a supervisor was on actual or constructive notice of the deficiency of training by showing a widespread pattern of similar constitutional violations by untrained officers or by showing that need for training was obvious. See Connick, 563 U.S. at 62.

In the instance case, the allegations of the complaint list several prior incidents of wrong doings by officers and appears to assert that these incidents form a widespread pattern of similar constitutional violations to demonstrate notice to the supervisory defendants of inadequate training

and deliberate indifference when they failed to respond. The first incident is a denial of medical care for breathing difficulties. Riggins states that he was denied a breathing treatment on March 10, 2017, told to sign up for sick call on March 11, 2017, and on March 12, 2017 denied treatment again. (Doc. 41 at 44). The second incident relates to excessive force used on May 13, 2017. Riggins claims that chemical spray was used on him for the purpose of intimidation and supports the veracity of his claim with: (1) the fact that his timeline of the incident is more in line with the body chart time stamp than Defendants' version of the incident, and (2) the fact that he did not receive a disciplinary charge for failing to follow direct orders, as reported by officers. Third, Riggins insists he notified supervisors (Stewart and DeSpain) that another inmate informed him that Holman officials were willing to pay inmates to do him serious physical harm. Fourth, he asserts that the supervisory defendants all knew of that he was denied medical care following his seizure on June 14, 2017. Fifth, he further asserts that the supervisory defendants were aware that he was forced into B-Dorm on October 8, 2017 and was stabbed. Sixth, Riggins alleges that chemical spray was again used on him on February 28, 2018 despite his compliance, supported by the fact that he never received a disciplinary charge for failing to follow orders. These alleged violations are recognizably distinguishable from one another and cannot be grouped together to characterize one pattern of conduct. Rather, the incidents are better grouped as follows: two of these incidents involve the CERT team and use of chemical agents; two center on denials of medical care, arguably one serious medical need and the other not (unresponsive for hours following a seizure, lying in blood, urine, and feces, and breathing difficulties that never worsened and resolved on their own, respectively); and two maintain threats of bodily harm, arguably one specific and one general. As previously discussed, a general threat of harm and minor medical needs are insufficient to establish constitutional violations. As such, the Court will discuss whether

the two excessive force violations by CERT team officials, denial of medical care following the seizure, and being forced into B-Dorm with knowledge of threats of bodily harm establish a failure to train.

Riggins strongest evidence lies with the two incidents of CERT team excessive force. However, in this case, the incidents are unpersuasive because of the extreme remoteness in the time over which they occurred. Notably, the incidents are almost a full year a part and, consequently, are unconvincing of a widespread pattern and are better viewed as isolated events. See Denham v. Corizon Health, Inc., 675 F. App'x 935, 942-42 (11th Cir. 2017) (per curium) (finding that two prior incidents of allegedly similar constitutional violations do not establish a pattern sufficient to support a failure to train); Keith v. DeKalb Cnty., 749 F.3d 1034, 1053 (11th Cir. 2014) (finding one prior incident insufficient to provide notice to the supervisor that the training was constitutionally deficient). Also incapable of establishing a pattern sufficient to support a failure to train are the remaining incidents of denial of medical care and use of force into dormitory with knowledge of threats of harm. These incidents are just too distinct from one another to put the defendants on notice of a failure to train. Riggins offers little beyond general, conclusory allegations that Holman guards had used excessive force on him in the past, that violence at Holman was prominent, and that the supervisory defendants had knowledge of the same. Therefore, the Court finds that Riggins has failed to allege a pattern of prior constitutional violations sufficient to support a failure to train theory.

Moreover, Riggins has not shown that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 & n.10., 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

Significantly, neither the Supreme Court of the United States or the Eleventh Circuit has ever found that a need for training was "so obvious" as to support a failure to train cause of action without a prior pattern of constitutional violations established. Stephens v. City of Tarrant, 2:16-CV-274-KOB, 2017 WL 2797080, 2017 U.S. Dist. LEXIS 100344, *21-22 (N.D. Ala. June 28, 2017). Instead, the "hypothetical exception" has been applied only in an example by the Supreme Court, explaining that an obvious training need would likely exist "in the use of deadly force where firearms are provided to police officers." Canton, 489 U.S. at 390 n.10. The allegations in this action do not reach that of Canton's narrow and rare exception so as to fit within the "so obvious" category.

Accordingly, Defendants are **GRANTED** summary judgment on the failure to properly train.

### vii.     Failure to Protect from Correctional Staff.

The crux of Riggins' complaint is that Defendants "had knowledge of the excessive and unusual high level of violence at Holman Prison, and the ongoing threats of assaults being visited upon plaintiff" and that the supervisory defendants "failed to take action to make plaintiff safe". (Id. at 18-19). He asserts this claim in relation to both inmate assaults and constitutional violations by correctional staff. The Court has previously discussed and determined the supervisory defendants are not liable for failing to protect Riggins from the single known inmate attack on October 8, 2017. The Court now addresses Riggins' claim in relation to the supervisors' liability for failing to protect him from a substantial risk of harm from correctional officers.

Taking as true, for purposes of this motion, Riggins' version of the facts alleged in the complaint, Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1305 (11th Cir. 2015), Riggins notified various Holman officials of the following: received threats in March 2017 by

correctional officers not to go to the health care unit or that the CERT team may harm him;[14] denial of medical care in March 2017; excessive force used in May 2017; warning received in May 2017 that officers are willing to pay inmates to physically harm him; denial of medical care in June 2017; being forced into B-Dorm despite threats of harm by inmates in October 2017, and excessive force used in February 2018. Riggins also alleges that Warden Raybon asked him if he "would be willing to be assigned to any population dormitory." (Doc. 13 at 9). Riggins further alleges that Classification Officer "DeSpain would often make statements to plaintiff such a 'Riggins you know Raybon don't like your ass' and 'you know these folks pissed off with you about giving that woman panties to I&I Investigator' 'you know they got your ass labeled as a snitch' 'just be cool I'm trying to get you to a level 4 camp but Raybon keep stopping it'". (Doc. 1 at 16). Riggins contends the notification of these cumulative incidents demonstrates the supervisory defendants knew that he was at risk for harm by the correctional staff, both directly and indirectly through encouraged inmate attacks.

In response to Riggins' allegations, the supervisory defendants have submitted sworn affidavits stating the following:

> Warden Cynthia Stewart declares that she did not instruct Mr. DeSpain "to do nothing" with the March 14, 2017 letter that Riggins alleges to have submitted complaining of threats being offered to harm him. (Doc. 27-1 at 3). She affirms "[t]his is an untrue statement and I have no knowledge of the allegation inmate Riggins is referring." (Id.). Defendant Stewart admits that she returned Riggins' February 28, 2018, letter to him unopened because on February 28, 2018, during an Institutional Segregation Review Board meeting, Riggins was "very disrespectful and belligerent", used "vulgar statements, referred to [her] as a Bitch and a Whore and stated sexual implicit overtones towards [her]." (Id.). Defendant Stewart contends she "was not going to be subjected to inmate Riggins' abusive language" and has no knowledge of the contents of the letter. (Id.).

---

[14]     This notification was addressed to Ms. Dodd, a mental health supervisor, but specifies that the letter is to be copied to his institutional file. (Doc. 41 at 43).

Classification Specialist William DeSpain denies advising Riggins that anyone disliked him. (Doc. 40-1). DeSpain admits advising Riggins that he needed to refrain from negative behaviors to assist with getting his risk assessment to a point level that would allow for more favorable classification recommendations. (Id.). DeSpain further affirms that "[o]n May 17, 2017 Riggins submitted a hand written complain wishing to add another inmate onto his enemy list. On May 22, 2017, an enemy validation committee investigated the situation and the complaint was unsubstantiated for enemy validation." (Id.).

Warden Terry Raybon declares he does not recall asking Riggins if he was willing to go to any population dormitory upon release from the segregation unit. (Doc. 27-2 at 2).

Warden Phillip Mitchell affirms generally that he did not fail to provide inmate Riggins with proper protection and security. (Doc. 27-3 at 3).

Captain Jeff Emberton affirms generally that he has no "knowledge or testimony" regarding the threats of harm communicated by Riggins. (Doc. 27-4 at 2).

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer, 511 U.S. at 832) (alterations and quotations omitted). To survive this motion, Riggins must establish facts necessary to show the supervisory defendants "disregarded [a] substantial risk by failing to act in an objectively reasonable way to alleviate the risk," and that the supervisory defendants " 'acted with a state of mind that constituted deliberate indifference.' " Estate of Owens v. GEO Grp., Inc., 660 F. App'x 763, 767 (11th Cir. 2016) (citations omitted).

In this context, deliberate indifference requires: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence. [Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) ]; see also Ray v. Foltz, 370 F.3d 1079, 1083 (11th Cir. 2004) ("Deliberate indifference is not the same thing as negligence or carelessness."). Thus, a prison official may have subjective knowledge only if he had both knowledge of specific facts from which an inference of risk of serious harm could be drawn, and he actually drew that inference. Carter[ v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003)]. And, therefore, a plaintiff's claim will fail as a matter of law in the absence of actual knowledge of the substantial risk, because to hold otherwise would impermissibly vitiate the subjective component of the analysis. See Farmer, 511 U.S. at 837-38.

Id. "Whether a prison official has the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842. Where an official has the knowledge of a substantial risk and has the ability to prevent or discontinue a known constitutional risk and fails to exercise his or her authority to stop the constitutional violation, liability may be imposed. Keating v. City of Miami, 598 F.3d 753, 765 (11th Cir), cert. dismissed, Timoney v. Keating, 562 U.S. 978 (2010); Ledlow v. Givens. 500 F. App'x 910 (11th Cir. 2012) (per curium) ("Even when an officer is not a participant in the excessive force, he can still be liable if he fails to take reasonable steps to protect the victim.") (citation omitted).

In the current action, the supervisory defendants have provided scant answers and testimony in response to Riggins' allegations. There is no virtually no acknowledgment by the defendants of whether they received Riggins' written or verbal communications of harm, and furthermore, whether they investigated the claims asserted by Riggins (beyond DeSpain's averment that inmate Williams was not validated as an enemy of Riggins following an investigation).[15] Based on the record before the Court, a trier of fact could find that some or all of the supervisory defendants were objectively aware that Riggins faced a substantial risk of harm by correctional staff due to being labeled a snitch. Harmon v. Berry, 728 F.2d 1407 (11th Cir. 1984) (acknowledging that labelling plaintiff a "snitch" exposed him to inmate retaliation). It is undisputed that Riggins never received a disciplinary charge following any uses of force against him. Thus, a jury could reasonably find that the force applied may have been applied maliciously

---

[15] Even Defendant DeSpain in his acknowledgement of Riggins' letter requesting enemy validation fails to respond to Riggins' assertion that he was told by Inmate Williams that Holman officers were willing to pay inmates to harm him.

and sadistically and failure of the supervisory officials to investigate the same could evidence the required intent to establish a failure to protect claim. A jury could also find, based on the verbal comments and threats made by correctional officials that the officials subjectively intended to harm Riggins and/or failed to act to stop harm. It is also reasonable that a jury may deduce subjective intent of disregarding a risk of harm to Riggins based on the undisputed fact that when this complaint arose, Riggins was in the middle of litigating a previous lawsuit against Holman correctional officials (in particular Regina Bolar), specifically depositions and settlement conferences were being held. Furthermore, it is premature to determine exactly what facts were known to the supervisory defendants without the benefit of the material facts related to the June 14 and October 8, 2017 incidents, for which the Court has denied summary judgment.

At this stage, and on the pleadings alone, it cannot be determined whether the supervisory defendants possessed the requisite knowledge for purposes of liability. Consequently, Riggins has carried his burden of showing genuine issues of material fact remain, and Defendants Stewart, Raybon, Mitchell, DeSpain, and Emberton are **DENIED** summary judgment on failure to protect Riggins from harm from correctional staff, at this time.

### viii. Negligence.

In his complaint, Riggins alleges that Defendants had a duty to maintain "a safe and secure environment, free from prolonged stabbings and beatings at the hands of correctional staff and inmates. Defendants also had a duty to promptly report and investigate any incidents or complaints of physical assaults, and intimidation at the hands of correctional staff and inmates", and Defendants' negligent failure to do so violated his Eighth Amendment right to be free from cruel and unusual punishment. (Doc. 13 at 20). Negligence, however, does not serve as a basis for liability under § 1983. Daniels v. Williams, 474 U.S. 327, 328, 106 S. Ct. 662, 663, 88 L.Ed.2d

662 (1986) (the "negligent act of an official causing unintended loss of or injury to life, liberty, or property" is simply not implicated under the Constitution).  Instead, section 1983 requires that a state actor be deliberately indifferent to a known risk of harm to constitute a failure to protect claim.  Estelle v. Gamble, 429 U.S. 97, 105-106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  Accordingly, summary judgment is **GRANTED** in favor of Defendants on all claims of negligence.

## V.  CONCLUSION

For the reasons stated herein, the Court determines that summary judgment is **GRANTED in part** and **DENIED in part**.  Summary judgment is denied as to the following:

1. **Defendants Banks, Brown, House, Siler, Smith, Tait, and Raybon** are **DENIED** summary judgment as to Plaintiff's claim that they failed to provide him medical care following a seizure on June 14, 2017.

2. **Defendants Bolar, Banks, Brown, Boudreaux, Lang, Tait, House, and Siler** are **DENIED** summary judgment as Plaintiff's claim that they failed to protect him from an inmate attack on October 8, 2017.

3. **Defendants Stewart, Raybon, Mitchell, DeSpain, and Emberton** are **DENIED** summary judgment as to Plaintiff's claim that they failed to protect him from constitutional violations from correctional staff while incarcerated at Holman.

As to all other claims alleged by Plaintiff Riggins in his Amended Complaint, summary judgment is **GRANTED**.

This case is **REFERRED BACK** to the Magistrate Judge for additional proceedings.

**DONE** and **ORDERD** this 26th day of September 2019.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE